# Federal Defenders
## OF NEW YORK, INC.

One Pierrepont Plaza-16th Floor, Brooklyn, NY 11201
Tel: (718) 330-1200 Fax: (718) 855-0760

David Patton
*Executive Director and*
*Attorney-in-Chief*

Deirdre D. von Dornum
*Attorney-in-Charge*

November 13, 2023

**Via ECF and Email**
The Honorable Pamela K. Chen
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, New York 11201

Re:    United States v. Dwayne Patterson, 21-CR-524 (PKC)

Your Honor:

I write in anticipation of sentencing, which is scheduled for November 20, 2023. On February 2, 2022, after nearly five months of pretrial detention, this Court released Mr. Patterson on a considerable leap of faith. In his heart, Mr. Patterson understood that his freedom—even if temporary; even if circumscribed—had to be earned. To Your Honor, to his family, and most importantly, to himself, he vowed that he would not take that freedom for granted. Mr. Patterson recognized that he could not comply with the Court's requirements simply by force of will. Rather, he had to address long-simmering grief, mental health and substance abuse challenges to rebuild himself anew, and for good. Over a steady course of more than two years, Mr. Patterson has demonstrated that this Court's confidence in him was not misplaced.[1] He completed thirteen months of mental health and substance abuse treatment, stabilizing the schizophrenia and severe depression that had so often negatively impacted his mood, thought patterns, and decision-making. He deepened his family relationships, relying on his sisters for emotional support, and becoming a role model to his nieces and nephews. And consistently, he has worked, building a career as a museum associate to glowing reviews. He kept his word. *See* Ex. A (letter from Dwayne Patterson).

Over nearly two years on pretrial release, Mr. Patterson has demonstrated a sincere amenability to supervision. Released first to the inpatient substance abuse program at Arms Acres, Mr. Patterson successfully completed it, and then seamlessly engaged in and completed rigorous outpatient substance abuse and mental health treatment. From March 2022 until March 2023, Mr. Patterson complied without violation with home detention, leaving only for treatment, for classes in which he earned his OSHA certification and security license, for family events

---

[1] Mr. Patterson recognizes that he shook this Court's trust by his local arrest on July 7, 2023. All charges were dismissed on September 8, 2023. Following this Court's continuation of his release on bond, and his relocation to a new address, Mr. Patterson has complied with all conditions of his updated release order.

when permitted by the Court, and for work. From June until November 2022, he worked as a security guard. Then, on his own, he sought out mentorship and support from a reentry program. They connected him to a newly opening museum, where he first assisted in physically building out the space, and then was promoted to tour guide. He has held his full-time job for more than eight months. In March 2023, recognizing his steady progress, this Court granted his motion for a curfew, with which he has complied for the ensuing eight months. In other words, Mr. Patterson has met or exceeded every expectation the Court set for him at his release, which was by no means guaranteed. Through his actions, he has demonstrated that he is a fundamentally reformed person for whom any additional period of incarceration is unnecessary. We urge the Court to impose a sentence of time served with an intensive period of supervised release.

## I.     Objections to the Presentence Investigation Report

The Presentence Investigation Report ("PSR") accurately captures the offense conduct, Mr. Patterson's history and characteristics, and the guidelines calculation, though, as discussed below, they vastly overstate an appropriate sentencing recommendation. There is one minor error in the PSR: on the front page, Mr. Patterson was released on February 7, 2022, not February 4. And Paragraph 27 requires an update: on June 10, 2023, Mr. Patterson was successfully discharged from New York State parole, as confirmed on the NYDOCCS parolee lookup site.

## II.     The Instant Offense Was an Unfortunate Backslide In a Life in Progress

At thirty-six years old, Dwayne Patterson (known to some by his nickname, Justice) is too old, too mature, and too humble to blame his present circumstances on his childhood and adolescence. But in many ways, both positive and negative, his life experiences brought him here. Mr. Patterson grew up in primarily in Brooklyn. Prior his parents' marriage, his father already had three young children and his mother had one. In 1995, when Dwayne was eight and his sister Dyasia was two, their parents separated; their father moved to North Carolina. Dwayne was bullied in school. When he was twelve, he was sent to live with his father. He returned to New York at sixteen, and graduated from high school two years later. He maintains a close relationship with his father, who has major health challenges arising from prostate cancer and cardiac issues, undergoing heart surgery last year. His parents each had additional children; Mr. Patterson is close with nine siblings, and their children.

Dwayne's day-to-day life was marked by the challenges of an impoverished neighborhood. His mother worked hard to support her family paycheck-to-paycheck, but she struggled with an addiction to crack cocaine. Dwayne and his siblings first began to notice her use of crack when he was seven or eight years old, when their parents were going through their separation; her addiction lasted around fifteen years. In 2007, Mr. Patterson was twice the unintended victim of a shooting. In 2013, while Mr. Patterson was at the nadir of untreated mental illness, as described in Part III, a man raped his sister. He spiraled out of control, shooting the perpetrator on February 19, 2013 out of anger and revenge. He was arrested following an unrelated fight in March 2013 and for a DUI in April of that year. Within the year, he was arrested twice more. Eleven of his criminal history points account for actions in little over one terrible year. Mr. Patterson was unchecked and untreated, leading to a lengthy prison sentence. Young and bull-headed, he struggled in prison, too.

When he was released on parole in December 2020, Mr. Patterson strived to maintain his freedom and build a law-abiding life. He moved back home with his mother and two sisters. He refrained from drugs, and completed drug, alcohol, and anger management programs. He found work as a security guard and eventually, as a prep cook for a catering company. He had no parole violations. But believing himself to be stable, Mr. Patterson overconfidently stopped taking the psychotropic medication that had stabilized him. On June 27, 2021, he lost his mother—forever his most significant support—to breast cancer at the age of fifty-five. Overcome by having lost six-and-a-half of the last seven years with his mother due to his prison sentence, Mr. Patterson fell apart. He fell into a frightening and deep depression, which he self-medicated through substance abuse.

The instant offense was a tragic suicide attempt, and not his first. He acquired a gun to end his life, telling himself and his loved ones, "I just want to be with my mom." His warped and mentally ill thinking was made all the more tragic by inadvertently endangering others by his conduct, as he had himself suffered back in 2007. Mr. Patterson credits his arrest as a wake-up call. When undersigned counsel showed Mr. Patterson video footage of the offense, he was horrified by his conduct. His pretrial incarceration at the MDC got him back on psychiatric medication, and this time, when released, he had the courage and good sense to stay the course, and to supplement it with long-needed therapy.

### III.     Mr. Patterson Has Undergone Comprehensive Treatment to Understand and Overcome Severe Mental Illness and Substance Abuse

Since he was a teenager, Mr. Patterson endured a vicious cycle: during periods of incarceration, he received psychiatric treatment and medication; then, when released, he thought he could make it on his own, which ultimately backfired—in this case, spectacularly. On January 10, 2022, Dr. Jerome Norton conducted a psychological evaluation of Mr. Patterson while he was at the MDC. *See* Ex. B. Mr. Patterson reported first experiencing auditory hallucinations and paranoia at seventeen or eighteen. At nineteen, on Rikers Island (for a since-dismissed charge), he was overcome by his symptoms and placed on suicide watch for the first time. During his seven-year state sentence, served from 2014-2020, he was again placed on suicide watch after attempting to hang himself. He was placed on psychiatric medications including Risperdal, Seroquel, and Remeron, which eased his symptoms. At the MDC, from September 2021 until his release in early February 2022, he sought mental health care multiple times, never receiving it. In the community prior to the instant arrest, Mr. Patterson did not seek or receive mental health care or medication. Instead, he treated his symptoms by smoking marijuana and drinking three pints a day of alcohol until he blacked out. Dr. Norton recommended residential substance abuse treatment at a program with on-site psychiatry to treat his co-occurring schizophrenia. *Id*. at 3.

From February 7, 2022 until March 7, 2022, Mr. Patterson enrolled in and successfully completed the Arms Acres residential drug treatment program in upstate New York. When he returned home, he reported as directed for continued outpatient drug treatment, therapy, and psychiatric care at Arms Acres' Queens location. Mr. Patterson remained in compliance with an intensive treatment regimen. For more than a year, Mr. Patterson engaged in group therapy three days a week, individual therapy once a week, and met with his psychiatrist as directed. He was prescribed Remeron and takes it as directed. On March 16, 2023, he graduated from Arms Acres,

having successfully met all of his treatment goals. Ex. C. His mental health care is ongoing. Mr. Patterson has been humbled by his experiences over the last year. He recognizes that he is a human being who requires mental health care to keep his mood steady and to ward off feelings of anxiety and depression. Psychiatric treatment and breakthroughs in counseling have enabled him to forge deeper relationships with his father, sisters, and relatives, to mentor his nieces and nephews, and to succeed in work. He recognizes these benefits and is committed to remaining on track. *See* Ex. A.

## IV.    <u>Mr. Patterson Has Demonstrated a Sincere Commitment to a Law-Abiding Life, Complying with Strict Restrictions on His Liberty, and Building a Successful Career</u>

On February 7, 2022, Your Honor took an enormous chance on Mr. Patterson, releasing him on bond to the most restrictive conditions allowed by the Bail Reform Act outside of incarceration. When he completed inpatient treatment, he was at first confined to his sister's home twenty-four hours a day, seven-days-a-week, with leave only for medical emergencies and treatment. In time, with the support of Pretrial Services, the Court moderated the conditions to home detention, permitting him to engage in vocational training. Mr. Patterson completed his OSHA 30 certification and earning his security guard license. Soon enough, he found employment at Allied Universal Security, where he worked as a guard at a residential building. When hours became sporadic, he supplemented his income working shifts at Sottile Security, serving as a guard at a men's shelter. Recognizing his progress during a year of house arrest, in March 2023, this Court removed the home detention condition, placing Mr. Patterson on a curfew. Throughout, he has complied with the stringent restrictions of location monitoring, first at his sister's home, then his girlfriend's, and now with a friend. For nearly two years, he has been unable to go where he wants whenever he wants, and has exercised patience and understanding at his schedules and restrictions, even when frustrated by their limits.

In the spring of 2023, Mr. Patterson began thinking seriously about building a career, rather than a series of security jobs. On his own initiative, he connected with A Second U, a reentry program that "provid[es] second chances for formerly incarcerated people" through partnerships with local employers. *See* A Second U Foundation, https://asecondufoundation.org/. A Second U connected Mr. Patterson to THC NYC, an interactive museum experience that was slated to open (and did) in spring 2023. After a series of interviews, Mr. Patterson was hired.

Mr. Patterson has excelled at his job, frequently working more than forty hours a week. First, he was tasked with the manual labor of building out the museum. Based on that experience, his employers promoted him to the role of museum attended. Both the operations manager and the assistant manager speak of his work with the utmost regard. *See* Exs. D-E. "From the moment we met," says his boss, "he showed me nothing but kindness and respect, and proved to be one of the most diligent and thoughtful workers I have had the opportunity to work with here at THC NYC." Ex. D. "I am thankful for him and his work ethic, determination to always grow, and insistence to go above and beyond the expectations set upon him. He is an asset to my team, a leader amongst his teammates, and a beacon of positivity in the museum." *Id*. He "exemplifies so many of our ideals: diligence, personality, empathy." Ex. E. Employment provides him a daily routine, and keeps him focused. He works every weekend, and overtime whenever he can. He

provides his schedules and his paychecks to Pretrial every week, demonstrating his responsibility and compliance. Recently, he referred his sister for employment, and she was hired. Mr. Patterson is proud to have maintained and advanced in his career for more than eight months, with every intention to remain there as he builds his savings and a steady future. He looks forward to securing a residence of his own.

## V.    Mr. Patterson Was Incarcerated for Nearly Five Months at MDC Brooklyn, During Dangerous and Restrictive Pandemic Conditions

Following his writ from local into federal custody on September 20, 2021, Mr. Patterson was remanded to MDC Brooklyn during the COVID-19 pandemic. Mr. Patterson remained at the MDC until his release on bond on February 7, 2022. Those four-and-a-half months saw near constant lockdowns. In an effort—and not a particularly successful effort—to mitigate the spread of the virus, the BOP enacted significant measures restricting the liberty of inmates. Mr. Patterson spent much of that time in near-isolation conditions tantamount to unwarranted disciplinary segregation. Inmates were confined to their cells, with the exception of 30 minutes, one-to-three times a week, for showers, or in lieu of a shower, a quick telephone call. Conversely, prior to the pandemic, inmates were permitted out of their cells from 6:00 AM until 3:30 PM, and then again from 5:00 PM until 9:30 PM. During that time, they could exercise, engage in programming, speak with their families, visit with their families, and seek meaningful rehabilitation. The restriction, during waking hours, from 14 hours a day, seven days a week out of the cell to 30 minutes a couple times a week was significantly harsh, and unwarranted. It meant that the time Mr. Patterson served during that period was undeniably more difficult, in every way, than prior to the pandemic.

The court should weigh the increased danger and diminished conditions to which Mr. Patterson was subjected when determining the "total harm and benefits to prisoner and society" that any additional term of imprisonment will yield. *United States v. D.W.*, 198 F. Supp. 3d 18, 23 (E.D.N.Y. 2016); *see Davis v. Ayala*, 135 S. Ct. 2187, 2209 (2015) (Kennedy, J., concurring) (calling for heightened judicial scrutiny of the projected impact of jail and prison conditions on a defendant; *United States v. Mateo*, 299 F. Supp. 2d 201, 212 (S.D.N.Y. 2004) (reducing sentence where defendant's pretrial conditions were "qualitatively more severe in kind and degree than the prospect of such experiences reasonably foreseeable in the ordinary case"); *United States v. Francis*, 129 F. Supp. 2d 612, 619-20 (S.D.N.Y. 2001) (reducing sentence in acknowledgment of "the qualitatively different, substandard conditions to which the Defendant was subjected" in pretrial detention). As Judge Rakoff held, "The pandemic, aside from posing a threat to [the defendant's] health, has made…incarceration harsher and more punitive than would otherwise have been the case. This is because federal prisons, as 'prime candidates' for the spread of the virus (citation omitted), have had to impose onerous lockdowns and restrictions that have made the incarceration of prisoners far harsher than normal." *United States v. Rodriguez*, 2020 WL 5810161, at *3 (S.D.N.Y. Sept. 30, 2020).

In recognition of the excessively punitive conditions of pretrial detention during the pandemic, judges have granted leniency in similar or even more serious cases. Judges have acknowledged that the unusual harshness of incarceration during these times diminishes the retributive or deterrent need for a guidelines sentence. And they have imposed terms of

imprisonment that are substantially less than the bottom of the defendants' advisory ranges. *E.g.,*
*United States v. Colon*, 15-CR-317 (MKB) (E.D.N.Y. Nov. 20, 2020) (imposing 18 months,
consecutive to defendant's 18-month state sentence, where bottom of guidelines was 100
months); *United States v. Shi*, 19-CR-451 (PKC) (E.D.N.Y. Nov. 2, 2020 (imposing no prison
where guidelines range was 12-18 months); *United States v. Piper*, 18-CR-008 (AMD)
(E.D.N.Y. June 25, 2020) (imposing time-served sentence on resentencing where defendant had
served approximately 24 months and bottom of guidelines range was 63 months); *United States
v. Vinas*, 20-CR-44 (EK) (imposing three-month sentence where bottom of guidelines range was
eight months) (E.D.N.Y. Apr. 20, 2020). In determining whether to impose any additional jail
time, the Court should consider both the unusual harshness of the time Mr. Patterson already
served during a dangerous period of the pandemic, and its lasting impacts on jail conditions.

## VI.    A Non-Incarceratory Sentence of Intensive Supervision Meets the Goals of Sentencing

      Given a chance, and on considerable risk, Mr. Patterson has not let this Court down. He
has completed mental health and substance abuse programs, earned a job, and then a better full-
time job, all while complying with location monitoring and supervision. Mr. Patterson served
nearly five months at the MDC during harsh lockdown conditions. Accordingly, returning him to
prison now, for any term—and certainly, for the period suggested by the guidelines—is
unnecessary, counterproductive, and destructive to the goals of sentencing. Mr. Patterson has
shown that when he is closely monitored and provided supports, he can maintain a law-abiding,
positive life.

      Supporting Mr. Patterson's plea for leniency and mercy—and in turn, what will make
him most likely to succeed—is the community he has built, because of the person he has
become. Mr. Patterson's efforts to fundamentally change his life over the last year-plus have
enabled him to grow and strengthen family bonds. *See* Exs. A, F-G. In additional to his family of
origin, Mr. Patterson has deepened his friendships with educated, working professionals,
including his boss. Ex. E. Mr. Patterson is humble, thoughtful, and kind, not to accrue a
sentencing benefit, but because of his character and his commitment to change.

      Mr. Patterson has proven through his actions that he does not need to be deterred or
incapacitated by incarceration. He has finally outgrown and surpassed the bull-headed, quick-
tempered young person who refused help and solved problems through substance abuse or
violence, including to himself. Surely, he has proven that he has been rehabilitated in terms of
employment and skills training, that do not require imprisonment. And so the only remaining
sentencing factor is punishment. As many courts have said, many times, "[i]mprisonment is not
the only way we punish." *United States v. Zimmerman*, 2012 WL 3779387 (E.D.N.Y. 2012)
(*citing Gall v. United States*, 552 U.S. at 48–49 (2007)). Should this Court sentence Mr.
Patterson to supervised release, Your Honor may add any number of special conditions or
reporting requirements. Having grown and changed so much, to now remove Mr. Patterson from
his job, his family, and his mental health stability is to weigh pure punishment over every other
factor. Respectfully, the circumstances of the instant offense do not carry that weight here.

Fundamentally, the ability and the willingness to change—and to sustain lasting change—falls to Mr. Patterson. He has accepted responsibility for his actions. Ex. A. He has demonstrated through his conduct that this change is true. While it is unfortunate and sad that it took this arrest for Mr. Patterson to grow up, he has a full life left in front of him, with the community supports, career, and knowledge to enable a law-abiding life, freed from the demons of grief, mental illness, and substance abuse. We respectfully submit that no additional incarceration is necessary to meet the goals of sentencing.

Thank you for your consideration.

Respectfully submitted,

_____/s/_____
Mia Eisner-Grynberg, Esq.
Assistant Federal Defender
Eastern District of New York
(718) 330-1257

cc:    AUSA Benjamin Weintraub (by email and ECF)
       United States Probation Officer Erica Vest (by email)

7

# **EXHIBIT A**

November 9, 2023

The Honorable Pamela K. Chen
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

Dear Judge Chen,

First and foremost I would like to start off by thanking you for this opportunity to remain at liberty over this past almost two years. I do understand that this was not something that was mandatory and something that you gave me an opportunity with. Over the course of this past two years I have found myself. I have grown a better bond with all 9 of my siblings as well as their children. For that I will forever be grateful. I now know the true meaning of family. I now know the true meaning of responsibility. And most of all, I have now become more aware of my mental health.

I could sit here and make excuses for my action back in September of 2021 and if I did there would not be any growth. I now realize I stagnated myself with my decisions and could have potentially lost my life as well as my freedom for many years to come. Being on an ankle monitor actually made me more aware of my choices. It also has made me want more for myself out of life. Before this situation I was not able to look myself in the mirror and take accountability for my actions. As I grow older and become wiser I had to reflect on my life and my life decisions. With that awareness I now want more out of life for myself as well as my family.

Although these times are trying, I have taken so many things from this situation to help me grow mentally as well as spiritually. I also would like to thank you for this opportunity because I have been able to be a part of my nieces' and nephews' lives and I now know how it feels to have someone look up to you. I am forever grateful for this Judge Chen. From the bottom of my soul I appreciate this.

During the course of this case I have held three different jobs and I had three different responsibilities at each job. Each job gave me an opportunity to meet different people and also look at these same individuals and learn a lesson in itself from each of them. I say a lesson because I have seen people without my worries who don't have stipulations on their lives. I just couldn't use that as motivation to get my life back on the right track.

I also would like to thank pretrial services. They, along with you, have given me this opportunity so I would like to thank them as well. I don't know where I would be in life mentally as well as physically had I not been given this opportunity. In closing, I do realize that what I did was the worst decision I have made in my life. I stand here today a better man and I would like to take accountability for my actions. I would like to apologize to my family. I would like to apologize to your honor. I also would like to apologize to pretrial as well as my lawyer.

My actions in September 2021 were those of a broken man. I stand here today healed and ready for the next chapter of my life. Once again I would like to thank you Judge Chen for allowing me to get my life back on the right track.

Sincerely,

Dwayne Eric Patterson Jr

2

# **EXHIBIT B**



# Diversified Psychological Services, PLLC
116 West 23rd Street, 5th Floor, New York, NY 10011

info@diversifiedhealth.org
ph. 646-492-0344, fax 646-417-6141

## Psychological Evaluation

Participant:          Dwayne Patterson
Date of Birth:        9/12/1987
Date of Examination:  1/10/2022
Date of Report:       1/14/2022
Examiner:             Jerome Norton, Psy.D. MSCP

## Reason for Referral:

Mr. Patterson was referred for a Psychological Evaluation by Mia Eisner-Grynberg, Assistant Federal Defender of the Federal Defenders of New York, for the purpose of providing diagnostic clarity and recommendations regarding post-release treatment.

## Background Information:

### Family/Social History:

Mr. Patterson is a 34-year-old, monolingual English-speaking Black male of Baptist faith. He was raised by his mother in Brooklyn until the age of 12 and subsequently with his father in North Carolina until the age of 16 at which time he returned to his mother's home. He has never married and has no children. In June 2021, shortly after his release from prison, his mother passed away secondary to Cancer. Prior to his current incarcerations, he was residing with his two sisters in Brooklyn. He plans to return to his sisters' home upon his eventual release from Federal custody. He maintains telephone contact with them, presently.

### Medical/Developmental History:

The defendant is not aware of any history of problems related to his gestation or birth or early development and reportedly did not receive Early Intervention services. He similarly did not recall a history of head injury or chronic ear infections, sustained high fevers, or major medical illnesses as a child. He has a history of gunshot wounds and reportedly has bullets remaining in his back and pelvis which cause chronic pain. He is otherwise reportedly in good physical health.

### Academic History:

Mr. Patterson achieved a high school diploma from Boys & Girls High School in Brooklyn in 2005. He denied a history a history of Special Education involvement or childhood diagnoses of ADHD or Learning disability. He did not repeat any grades.

*Vocational History*:
The defendant's work history is limited due to his multiple incarcerations as an adult. His only reported formal employment position was with 'Catering Geeks' working as a full-time Prep Chef from July 2021 until the time of his September 2021 incarceration.

*Psychiatric History*:
Mr. Patterson recalled first experiencing psychotic symptoms (auditory hallucinations and paranoia) at age 17 or 18. He did not receive psychiatric care until admitted to AMKC (Rikers Island) at age 19. He recalled having been placed on Suicide Watch due to being unable to cope with his symptoms. He acknowledged a pattern of accepting treatment while incarcerated but not pursuing treatment in the community. According to the same report, he was diagnosed with Schizophrenia while serving a recent 7-year DOCCS sentence. He reported, during the present evaluation, that he was treated with psychotropic medications (Risperdal, Seroquel, and Remeron). He recalled attempting to hang himself in 2019 during the same DOCCS admission and having been placed on suicide watch after officers intervened. He explained, "I didn't want to be here anymore, didn't want pain. Voices were saying 'Kill yourself. You're shit' and I believed them." He stated that he was housed in General population throughout his numerous incarcerations, and he has not been treated psychiatrically during his present MDC admission. He reported that he has filled out several 'Sick Call' slips but was only seen once by Mental Health staff to be informed that he would be "put on the list." He stated that he is motivated to engage in treatment upon re-entering the community.

*Substance Use History*:
The defendant recalled first using marijuana at age 19 and stopping eight years ago after completing a prison-based drug treatment program. He relapsed following the loss of his mother soon after being released from prison. He recalled chain-smoking marijuana and drinking three pint-size bottles of liquor daily, often to the point of blacking out. As with psychiatric treatment, he is motivated to participate in substance dependency treatment upon release.

**Evaluation Procedures:**

Clinical Interview via telehealth
Review of Available Records (9/21/2021 Pretrial Services Report by Jada Gross)

**Behavioral Observations:**

The participant was interviews via telehealth from MDC. He presented as adequately groomed, dressed in jail-issued attire. He appeared a generally fit-appearing man of his stated age. He was alert and fully oriented with neutral mood and full range of affect. He described his mood as "up and down" and that he sometimes "up all night, stressing." No signs of gross impairment in expressive speech or sensory or motor functioning were observed. He interacted in a friendly, cooperative manner, making appropriate eye contact. Though he reported a history of psychotic symptoms (auditory hallucinations and paranoid delusions), he did not present with common negative signs of Schizophrenia. His description of his late-adolescence onset of symptoms is

2

consistent with first-break Schizophrenia. However. Considering the absence of clinical records and the brief (one hour, virtual) interview, the defendant's self-reported history of psychiatric symptoms informs the undersigned's diagnostic impression.

## DSM-5 Diagnostic Impressions:

| 298.9 (F20.9) | Unspecified schizophrenia spectrum and other psychotic disorders, Provisional |
| 303.90 (F10.20) | Alcohol Use Disorder, Moderate, In early remission, In a controlled environment |
| 304.30 (F12.20) | Cannabis Use Disorder, Severe, In early remission, In a controlled environment |

## Summary & Recommendations:

Mr. Patterson will benefit from psychiatric and substance use recovery treatment upon reentering the community. His currently endorsed symptoms do not appear to be impacting his level of functioning to an extent that inpatient psychiatric treatment would be indicated. Though his alcohol and marijuana use disorders are presently in institutional remission, he would benefit from residential substance use treatment in a facility capable of providing treatment of co-occurring psychiatric conditions (i.e. a program with a consulting psychiatrist on staff). This would aid in preventing relapse and allow him to resume psychiatric treatment in a structured, supervised environment. He might then be stepped down to outpatient psychiatric and substance abuse (e.g., AA, NA) treatment. Considering his co-occurring psychiatric and substance use disorder and limited work experience, he might also benefit from a referral to ACCES-VR for vocational rehabilitation services.

Jerome Norton, Psy.D. MSCP
NY Licensed Psychologist #015821

# **EXHIBIT C**



**Arms Acres Outpatient Services**

Certifies to all that

*Dwayne Patterson*

Has successfully completed all requirements of treatment

From Arms Acres Outpatient Services

March 16, 2023

Clinical Director

Case Manager

# **EXHIBIT D**

August 19, 2023

Maggie SteMarie
maggiestemarie@thcnyc.com
720.903.0245

To Whom It May Concern,

My name is Maggie SteMarie, and I am the Museum Operations Manager for THC NYC. It has been my pleasure to work with, and oversee the work of Dwayne Patterson since I started at THC NYC on March 13th, 2023. Working with Dwayne for the last five months has been nothing short of rewarding – whether it be due to his work ethic in his daily job, watching him respond in the heat of an operational challenge that needs solving, or during small moments of everyday joy. Since the day I met Dwayne, he proved to me he was someone I could count on. From the moment we met, he showed me nothing but kindness and respect, and proved to be one of the most diligent and thoughtful workers I have had the opportunity to work with here at THC NYC.

At the start of his employment, Dwayne aided us in completing manual labor in the museum during buildout. The build process consisted of long days of manual labor, running up and down five flights of stairs to finalize the museum, and cleaning construction dust over and over again until it was spotless. During those build weeks, Dwayne was engaged, driven, and always positive. In addition to this, Dwayne was punctual to his shifts, always arriving early and communicative of any delays.

We opened the museum in April, at which point Dwayne's role in the business shifted from that of manual labor into a more performance oriented position as a Museum Associate. Museum Associates are tasked with memorizing scripts for all ten exhibitions in the museum, and treating our guests to a high standard of customer service. Dwayne has been exemplary in these areas, exhibiting a high level of skill in delivering the scripts to our customers, greeting and getting to know our guests, and helping drive team morale with his positive attitude. Dwayne has always asked for ways he can improve, aid the team further, and has helped fellow teammates when they were unable to attend their shifts by providing coverage. Beyond this, on multiple occasions, Dwayne has offered his time on days he was not scheduled to work, and came to assist in operations when we called needing support.

Working with Dwayne has been a pleasure – I am thankful for him and his work ethic, determination to always grow, and insistence to go above and beyond the expectations set upon him. He is an asset to my team, a leader amongst his teammates, and a beacon of positivity in the museum.

Thank you for your time, and should there be any need to confirm the facts in this letter, I will do so as necessary.

Sincerely,

Maggie SteMarie

# **EXHIBIT E**

To whom it may concern:

For as long as I've known him, Justice has been a source of warmth and compassion. He treats everyone with such immense kindness, and takes a genuine interest in their wellbeing. It's common to hear him asking "did you sleep okay?" or "have you eaten enough today?" Having him on our team has meant having a confidante, a hard worker, and someone who is willing to help out wherever possible. He's been more than willing to be flexible in order to accommodate the needs of others, even if it means being stuck in the same spot for an eight hour shift.

Recently, it has been wonderful to see his relationship with his sister, as she started working with us just this past month. You can tell a lot about someone by the way they behave around their siblings. I had heard him talk about his family, and I took the way he spoke about them to mean that he loved them dearly. After being in the room with him and his sister, I came to realize that how he treated me was not entirely unlike how he treated his own family. That speaks volumes of his compassion and his upbringing. As someone who deals with hurtful and problematic behavior from men on a regular basis, it has been so refreshing to see a man who uplifts and supports the women around him, and does so proudly.

It is evident that Justice is working towards being the best possible version of himself. I have had numerous conversations with him about mental health, and the importance of therapy. I happen to know he's looking to start weekly sessions, and am thrilled that he's taking such a huge step.

Speaking interpersonally, whenever there has been a misstep or any sort of argument, I have never heard of it ending without Justice offering an apology, taking accountability, or otherwise wanting to remedy the situation in a civil manner. These issues have been few and far between, but I am grateful to have an example to point towards for other fellow employees to understand how to resolve conflicts. I have never felt as if Justice wouldn't be receptive to any sort of feedback, which is imperative as our place of employment is constantly changing. As a manager, I look for those who lead by example, especially when bringing in new hires. Justice exemplifies so many of our ideals; diligence, personality, empathy. We see so many faces come through our doors every day, it can often be difficult to make a connection. Yet, I have seen him make connections with every receptive individual

who comes through the experience. I've heard them laugh at his quips when I'm in the room over, I've heard them tell him anecdotes in response to questions he asks them, and taken note of the originality he has given to the scripts we have been sitting with for months.

No matter what his personal life has yielded from day to day, I have seen him strive and succeed in spreading positivity. Despite the difficult days, the sick days, the sad days, he comes in and gives it his all.  There have been times where I've needed someone to talk to or sought support for my own personal struggles. Justice has proven time and time again that he is a safe space when I have needed it, even if he is not feeling one hundred percent himself that day. As his manager, I am lucky to have him as a colleague, as a mentor for our new staff, and as part of the team. As his friend, I am so incredibly grateful for the opportunity to be vulnerable in our conversations, to bring levity to some truly dark times, and to be able to see where he goes in the beacon of light that is the future to come.

If you need any more information, please do not hesitate to contact me.

MJ Abdul
*Assistant Manager, THC NYC*
madijoabdul@gmail.com

# **EXHIBIT F**

Daleah Dent
6508 Hunter Street
Milton, FL 32570
(347) 844-5384
daleah.dent@gmail.com


July 9, 2023


Dear Sir or Madam,

My name is Daleah Dent and I am Dwayne Patterson's eldest sister. I have two
sons that love and look up to their uncle. He has taught them no matter what
wrongs you have done, always own up to your mistakes. Even though we grew up
in different households and were kind of close as kids, we've gotten closer as
adults. We've celebrated Christmas together and also celebrated my oldest son
obtaining his masters degree. We're even collaborating on a book together. My
brother is an amazing person who has such great qualities about him. He's family
oriented, trustworthy, honest, hard working, reliable, creative and very supportive.
I'm not saying all of this because I have to or because I'm his sister. I'm saying this
because it's true. I love my brother with all my heart and I appreciate the bond that
we're building and continuing to build.

Thank you for taking the time to read my letter.


Sincerely,

D. Dent

# **EXHIBIT G**

Danielle Sheppard
2690 Cobb Parkway, STE A5-235
Smyrna, GA 330080
info@vanguardessence.com
347-952-6526

7 November 2023

Subject: Character Reference for Dwayne Patterson Jr

To Whom It May Concern,

I am grateful for the opportunity to write this letter on behalf of my brother, Dwayne Patterson Jr. I deeply appreciate your consideration.

I wholeheartedly love my brother, recognizing that he has made mistakes in his life. We face these truths without reservation, understanding that they were selfish missteps. However, I believe he has learned from them, and I hold this belief in my heart.

I say this because our conversations are now filled with discussions about real estate investment, building generational wealth, and prioritizing mental health. His language and newfound knowledge, gained through diligent research, highlight a significant transformation.

Having shared a similar background, I connect with my brother on a profound level. At 21, I had the privilege of joining the United States Army, an experience that instilled in me the discipline needed to become a contributing member of society.

It was a judge, much like yourself, who recognized the potential within me and granted me a second chance. Similarly, I have no doubt that my brother will one day express his gratitude to you for the same reason. He has changed because he aspires for a better future.

Surrounded by a circle of love, hard work, entrepreneurship, and relentless determination, he is positively influenced. Our conversations have evolved, marking the beginning of a transformative journey.

His aspirations to establish a real estate business align with my own ventures in the field. This isn't about me, but rather a testament to the support he has from family members who empathize with his journey and have navigated similar paths.

My brother holds immense significance in my life, and I envision a future where we run a business together. With your guidance, this dream edges closer to reality with each passing day. I commend you for perceiving him in a light he hadn't yet seen in himself, and for making it unequivocally clear that this was not the path chosen for him.

Once more, I extend my heartfelt gratitude for affording me the chance to pen this letter on my brother's behalf. We all need someone who awakens us, and you have done just that. I am

unwaveringly confident that with his renewed perspective, augmented by familial support and your wisdom, my brother will continue this positive journey—becoming not only an exemplary member of society but also an outstanding brother and uncle.

Thank you.
Warm Regards,


Danielle Sheppard